*In re* MARRIAGE OF CAROLYN DeGIRONEMO, Petitioner-Appellant, and WILLIAM A. DeGIRONEMO, Respondent-Appellee.

First District (4th Division)   No. 1—89—1660

Opinion filed December 6, 1990.

Jerome Marvin Kaplan, of Batler & Schwartz, of Buffalo Grove, for appellant.

Michael S. Schiffman, of Driscoll & Driscoll, of Schaumburg, for appellee.

JUSTICE JIGANTI delivered the opinion of the court:
The petitioner appeals from the trial court's denial of a post-trial

motion in which she sought vacation or modification of a judgment of dissolution and reopening of the proofs based on newly discovered evidence. In her appeal, the petitioner, Carolyn DeGironemo, presents the following issues for review: (1) whether the trial court erred in awarding petitioner $103 per week in child support; (2) whether the trial court erred in failing to continue the trial based on petitioner's assertion that she could obtain further evidence of the respondent's income; (3) whether the trial court erred in awarding the petitioner $10,000 as her share of the marital estate; (4) whether the court erred in failing to award the petitioner maintenance; and (5) whether the trial court erred in failing to reopen proofs based upon petitioner's assertion that she had evidence that the respondent had concealed his employment and income.

The parties were married on July 14, 1982. They separated approximately three years later, in November of 1985. The order dissolving their marriage was entered on December 12, 1988, approximately 6½ years after they were married. The couple had one child, who was approximately six years old at the time of the dissolution. While they were married, the family resided in a two-bedroom condominium which Carolyn and the child continued to occupy after the separation.

At trial, William DeGironemo, the respondent, testified that at the time of the marriage, he conducted business as Alpha-Com, Inc. The company, which was incorporated on November 25, 1980, consisted of William and one other employee, who was also a limited partner. In 1984, during the marriage, William formed a holding company called Alpha American Industries, Inc., which included the stock of Alpha-Com, Inc., and the stock of American Plastic Pallets, a company that sold plastic pallets. Alpha American Industries engaged in the business of selling cellular mobile telephone equipment and manufacturing and selling plastic pallets. William asserted that he never received any income from Alpha American Industries, Inc.

William identified the 1980 corporate income tax return for Alpha-Com, Inc. The company paid out $117,400 in compensation to officers and $37,000 in salaries in 1980. William testified that he received $64,900 of the officers' compensation and half of the salaries. According to the 1982 corporate tax return, William received a salary of $11,720 in 1982. He was listed as the sole officer of the corporation. The company showed an overall loss. The corporate tax return for 1983 was a consolidated return for Alpha-Com and American Plastic. The return indicated salaries of $21,644. William testified that he did not know whether he received all of the salaries. Alpha-Com had

gross receipts of $391,000, but again posted an overall loss. Similarly, the 1984 corporate tax return of Alpha American Industries showed gross receipts of $686,761 with a net loss. Salaries paid were $54,247. William testified that the salary figure represented the combined salaries of himself and two secretaries. He did not recall how much of the 1984 salaries were his. The consolidated financial statement for Alpha American Industries for the years ending November 1985 and November 1986 showed gross income in 1985 of $709,264, with a net loss of $337,949 and gross income for 1986 of $473,831 with a profit of $2,105. The payroll expense for 1986 was $35,784. William testified that this figure represented income to himself and one secretary.

In 1984, when Alpha-Com, Inc., teamed with American Plastic Pallets, Inc., the corporation took out a $365,000 Small Business Administration loan. The loan is payable in monthly installments of $4,345 plus interest through August 19, 1991. At the time of trial, the balance owing on the loan was $288,000. The loan is secured by all of the assets of the company and personally guaranteed by the officer of the company. As of October 1987, the Small Business Administration had agreed to a reduction and settlement of the loan, although a final settlement had not been reached at the time of the consolidated financial statement. William also testified to several other loans outstanding, both corporate and personal. Together with the small business loan, William's debts total over $600,000.

William also testified to personal income tax returns. The couple's joint return for 1982 stated wages of $51,456 of which approximately $46,000 were attributable to William, and $5,284 were Carolyn's. The 1983 joint return indicated no salaries or wages. William testified that in 1983 he paid family expenses out of reimbursements from Alpha-Com. He testified that the couple's lifestyle did not change from before and that they continued to live in the same place, eat the same food, and dress in the same manner they had before. The rent for their home was $450 a month, and William had a Cadillac that the company paid for and maintained. William testified that a company noted on an amended 1983 tax return, Chicago Pallets, had $84,000 in sales in 1983. Chicago Pallets was a forerunner to the company formed in 1984 under the name American Plastic Pallets. William testified that he never received any income from Chicago Pallets in 1983. William and Carolyn's 1984 tax return indicated wages of $1,603, Chicago Pallet sales of $23,008, and profit of $2,370. William testified that in lieu of wages, the company paid for living expenses, such as automobile payments, gasoline and insurance expenses, and rent or mortgage.

William's 1985 individual tax return showed a net loss of $7,633 with no wages, and interest income of $3,109. At the time William was living in a home of his own, with a monthly mortgage of $2,250. William identified documentation showing that in 1985 he was reimbursed for expenses in the amount of $17,834 from Alpha-Com and $591 from American Plastic Pallets. For 1986, William's tax return showed income of $3,486. The return indicates that William was renting the Inverness home to Alpha-Com for $33,684 a year. In 1986 he drew reimbursements of $19,010 from Alpha-Com and $610.17 from American Plastic Pallets. William testified that he received no income from Alpha-Com in 1986, and no income from American Plastic Pallets in 1984, 1985, or 1986. William's 1987 tax return shows wages of $1,500, and total income of $3,402. The return indicates that the Inverness property in which William was living was still being rented to Alpha-Com.

William testified that in 1984 he purchased a house in Inverness, Illinois, for $292,000. He purchased the property before he and Carolyn separated, but she did not move into the new home with him. William stated that the total down payment for the house was $30,000 which he paid out of a bonus he had received in 1980. William testified that he had lied to the lending institution about his salary in order to obtain the loan. The house was placed in a trust with William as the beneficiary. His company paid the $2,250 monthly mortgage. William stated that the home was used as the corporate headquarters. During this time, William was also paying $595 a month for the condominium and utilities where his wife and child lived, and $500 a month in child support.

In 1987, William sold the Inverness home for $375,000, and used $53,404 of the proceeds to purchase another home in Palatine, Illinois. He was still married to Carolyn, but they remained separated. The purchase price for the Palatine property was $261,000. The Palatine home was also placed in trust with William as beneficiary. William stated that he again lied to the mortgage company about his income. The monthly mortgage payment was $1,700. At the time of proceedings, the balance on the mortgage was $207,000. William also carries a second mortgage on the Palatine property which had a balance at the time of trial of approximately $25,000. William testified that he took the $30,000 proceeds of the second mortgage and put them into American Plastic Pallets.

William testified that at the time of the proceedings, he was living in the Palatine home, which he had furnished with $5,000 worth of furniture. His current monthly expenses were $2,455 and he was pay-

ing Carolyn $1,100 a month. He was driving a 1987 Mercury which was being paid for by his employer. He and his son were covered under his medical insurance policy. He had terminated Carolyn's medical coverage under his policy. William testified that his only source of income at the time of the trial was through his employment at Bennett Communications and work he did independently, installing and removing car telephones. His yearly salary from Bennett was $39,000 or a net of $516 per week. On some weeks he also generated between $400 to $600 working independently. At the time of the trial in September of 1988, William testified that Alpha-Com had paid up his mortgage to December. Alpha-Com was still in existence at the time of trial.

William also testified that during the course of the marriage he purchased 12,000 shares of stock at $1 per share. Ten thousand dollars worth he purchased with money provided by his father and $2,000 worth he purchased for his son. He sold 5,000 shares and forwarded the money to his father. At the time of the trial he testified that his father retained 5,000 shares. William admitted that in purchasing the Inverness home he showed as an asset $12,185 in stock equity.

A representative of Citicorp, the mortgagee on the Inverness property, produced documents related to William's application for a financing loan. The loan application prepared in 1984 by William for the property in Inverness disclosed that he had worked for Alpha-Com for seven years. He was listed as president of the company with a gross monthly income of $16,600 and total monthly expenses of $3,370. An employment verification form submitted by Alpha-Com stated William's salary as $200,000 annually. William also submitted to Citicorp copies of joint tax returns for the years 1983 and 1984. The tax returns showed salary and wages of $200,000 for each year. In addition to income, William's loan application showed liquid assets of $985,000, real estate valued at $600,000, automobiles worth $39,000, and personal property in the amount of $50,000. Liabilities on William's loan application totaled $524,000, including an interim financing loan on the Inverness property of $256,000.

Carolyn DeGironemo testified that she is a high school graduate and has gone to dental assistants' school. Carolyn described her work history since her marriage to William as follows. For two years, until 1983, Carolyn worked for William at Alpha-Com and Chicago Pallets. Thereafter, she was employed as a dental assistant for eight months at $5 per hour. Carolyn testified that she was terminated from her dental assistant position because she has a history of epilepsy. In

1984, Carolyn worked as a waitress, taking home between $150 and $250 per week. Her next job was as a phone sales representative. She worked for a year and a half and took home approximately $475 a week. Carolyn then worked on an as-needed basis for a private catering company earning $8 per hour. Carolyn also worked as a hostess for another restaurant at $5 per hour. At the time of the trial, Carolyn was baby-sitting on a part-time basis, some weeks earning $120 to $180 and in some weeks not working at all.

On cross-examination, William introduced credit applications made out by Carolyn. In one application dated August 1985, Carolyn stated that she made $30,000 plus commissions annually in her occupation as a sales representative for Pay Fone Systems. In a Sears credit application Carolyn listed her income in January 1985 as $320 per week. In applying for a car loan in 1987, Carolyn listed her income as $2,000 a month. Carolyn testified that the figures on the loan applications did not accurately reflect her income and that she had in some instances falsified the figures or represented the combined income of herself and William.

At the time of the trial, Carolyn was paying $214 a month for a car she was buying. She testified that she still owed $9,500 on the car. She also owed $2,100 to Visa, $1,200 to Master Charge, $150 to Wieboldt's, $1,900 to Discover, and $2,100 to Sears. She had personal loans outstanding in the amount of $4,500, and attorney fees of $4,000. She does not have dental or medical insurance. Carolyn testified that education expenses for her child were $1,380 per year. Carolyn stated that her total expenses add up to $1,544 per month. This figure includes expenses for both her and the child. At the time of the trial, Carolyn was receiving $1,115 per month from William for rent, utilities, and child support. Carolyn stated that she would like to return to school on a part-time basis and work with teenagers as a counselor. At the time of trial, she had sent to a school for information on its curriculum, but had not pursued the endeavor further. She testified that her son would need after-school supervision if she worked, but she did not know how much it would cost.

In the way of personal property, Carolyn testified she owned a living-room set, two bedroom sets, a kitchen table, microwave oven, and two cabinets. She testified that when William left to move into the Inverness home, he took with him new kitchenware, including pots, pans, and dishes.

Carolyn testified that while she was married to William she found cash stashed in their home. She found an envelope containing $132,000 in a shoe-shine kit. Carolyn testified that she left the money

where she found it and did not ask her husband about it. Later she would periodically check the money until one day she found it was gone. When she asked William about the money, he told her he had put it into the business. William took the stand after Carolyn's testimony and stated that at no time did he have $132,000 stashed in the home or anywhere else. He testified that he did bring home $30,000 in cash once. The cash was later used as the down payment on the Inverness property.

At the conclusion of the evidence, the trial court found that the marital estate had no value. The court awarded Carolyn the sum of $10,000. William's take-home pay was established as that received from Bennett Communications. The court fixed child support at 20% of William's take-home pay, or $103 per week. The court denied Carolyn any rehabilitative maintenance and found that her debts were hers and William's debts were his. The judgment dissolving the marriage was entered on December 12, 1988.

On January 10, 1989, Carolyn filed a post-trial motion. In her post-trial motion, Carolyn sought vacation or modification of the December 1988 judgment, as well as a reopening of the proofs. Carolyn alleged newly discovered evidence as the basis for reopening the proofs. Attached to Carolyn's motion was an affidavit by Carolyn in which she stated that since the date the trial concluded, she had learned that William was still engaged in business under the name Alpha-Com. The trial court denied Carolyn's post-trial motion and this appeal follows.

■ Carolyn's first assertion on appeal is that the trial court erred in awarding only $103 per week in child support. Carolyn argues that the best evidence of William's income is not the salary he receives from his current employer, Bennett Communications, nor the income indicated on his personal tax returns, but the amount he was actually able to spend during the period of time to which the parties testified. Carolyn points to William's past expenditures of in excess of $3,000 per month and urges that this is the figure upon which the determination of support should be predicated. Citing to *Ivanyi v. Granoff* (1988), 171 Ill. App. 3d 411, 526 N.E.2d 189, Carolyn argues that where the net income of the father cannot be determined, the court should look not to the percentage guidelines of section 505(a)(1) of the child support section of the Illinois Marriage and Dissolution of Marriage Act, but to section 505(a)(5) and order an amount of support considered reasonable in the particular case. Ill. Rev. Stat. 1985, ch. 40, par. 505(a)(5).

Carolyn further argues that the trial court should have taken a

skeptical view of William's credibility given that he admitted that he had lied on loan applications. Carolyn urges the court to accept over William's denial her assertion that at one time he kept over $132,000 in cash in a shoe kit in his home. Carolyn also points to the fact that when questioned about Carolyn's alleged signature on the joint tax returns submitted with his loan application to Citicorp, William invoked his privilege against self-incrimination, refusing to acknowledge whether the signatures were in fact Carolyn's. Citing to *Christenson v. Christenson* (1968), 281 Minn. 507, 162 N.W.2d 194, Carolyn urges that as a consequence of William's invoking his fifth amendment privilege, the trial court should have stricken all of his testimony.

We do not believe the trial court erred in awarding Carolyn $103 per week in child support. In *Ivanyi v. Granoff*, the case on which Carolyn relies, the trial court found, and the appellate court agreed, that the defendant-husband's net income was indeterminable on the evidence offered. The unrebutted testimony offered by the defendant's expert was that the defendant's tax reportable income was greater than his actual or spendable income. The court declined to use the percentage guidelines of section 505(a)(1) of the Illinois Marriage and Dissolution of Marriage Act and instead determined the amount of child support that was reasonable under the circumstances. The court noted that the plaintiff-wife had the burden of showing the court what the defendant's income was.

In the present case, it is unrebutted that at the time of the dissolution proceedings, William was a salaried employee of Bennett Communications, earning $516.65 per week. William testified that he sometimes earned $400 to $600 per week working independently. William also testified to $46,000 in wages in 1982, the first year of the marriage. For the years thereafter, William's personal tax returns indicate little or no income. Although William's corporate returns indicate salaries paid out for the years 1982 and beyond, it is not clear from the evidence what portion of the salaries paid went to William. There was uncontroverted evidence that William had written off as business expenses of his corporation numerous living expenses, including a substantial mortgage payment. The petitioner has not alleged that these expenses were unreasonable business expenditures. (See *Rimkus v. Rimkus* (1990), 199 Ill. App. 3d 903, 557 N.E.2d 638.) It is further uncontroverted that William was personally and corporately liable for over $600,000 worth of debt.

If William's corporate and personal worth exceeded his liabilities, this fact is not supported by evidence. The only evidence of William's net worth is a financial statement he prepared in connection with a

loan application he testified was fraudulent in content. Carolyn herself labeled the loan application as fraudulent in impeaching William's credibility. There is evidence that the corporation Alpha-Com was still in existence at the time of the proceedings. Again, however, there is no indication of the worth, if any, of this company.

What evidence there is tends to indicate that William's corporations have operated with very little or no profit, and that the value of William's assets do not transcend the debt incurred to obtain them. It appears that William has an aptitude for shifting money around on paper, but it is not at all clear that he actually has any. In the absence of expert testimony or evidence to the contrary, the trial court's options were limited. The only evidence of a definite and regular income for William was the evidence of his salaried employment with Bennett Communications. Unlike the situation in *Ivanyi*, the evidence in this case directs the court to the net income guidelines rather than a finding of "spendable" or actual income.

Moreover, the petitioner's reliance on the case of *Stern v. Stern* (1989), 179 Ill. App. 3d 313, 534 N.E.2d 533, in which the appellate court found that the trial court did not make a proper determination of child support, is also misplaced. Unlike the petitioner in *Stern*, Carolyn had ample opportunity to testify to her needs and the needs of the child, and she did not allege that William failed to comply with her discovery requests.

■■ ■ As for the trial court's assessment of William's credibility, and the weight to be given each of the party's testimony regarding the $132,000 in cash, we do not believe that the trial court's finding that Carolyn's version of events was incredible was against the manifest weight of the evidence. (See *In re Marriage of Eltrevoog* (1982), 92 Ill. 2d 66, 440 N.E.2d 840.) We also do not believe that the trial court erred in failing to strike all of William's testimony because he at one point invoked his fifth amendment privilege against self-incrimination. We do not here address the issue of whether testimony should be stricken under such circumstances. Rather, we note that the petitioner failed to raise this issue to the trial court and has therefore waived it. We further do not believe that the testimony in question is so prejudicial as to warrant review, notwithstanding Carolyn's failure to raise it below. (*Barreto v. City of Waukegan* (1985), 133 Ill. App. 3d 119, 478 N.E.2d 581.) William invoked his privilege in response to a question about the genuineness of Carolyn's signature on a tax return he submitted to Citicorp in connection with a loan application. In view of the fact that William admitted that he lied about his income to the lending institution, we do not believe that the evidence at issue

had any significant bearing on the proceedings.

■ In a similar argument to the one above, Carolyn asserts that the court erred in awarding her only $10,000 as her share of the marital estate. Again, we believe the trial court acted properly in light of the evidence before it. Carolyn maintains that the court failed to apply the relevant factors of the disposition of property section of the Illinois Marriage and Dissolution of Marriage Act. (Ill. Rev. Stat. 1985, ch. 40, par. 503(d).) She argues that at the least she is entitled to a share of the approximately $70,000 in proceeds from the sale of the Inverness property and an interest in the stock purchased during the marriage, which Carolyn values at approximately $8,000. William testified that he used approximately $50,000 of the Inverness property proceeds to purchase the Palatine home. At the time of the dissolution proceedings, the Palatine property was mortgaged for approximately $230,000. There was no testimony indicating the market value of the Palatine property.

Despite the equity in the Palatine home and the stock, the uncontroverted evidence was that William's liabilities exceeded his assets. Carolyn insists that she should not be charged with the debts of the corporation, but offers no authority for this proposition. Carolyn herself argued to the trial court that William's corporations were but an extension of himself. Under section 503(d)(7) of the Illinois Marriage and Dissolution of Marriage Act, the liabilities of the parties are a factor to be considered in the disposition of marital property. In the present case, the trial court allocated to Carolyn her debts of approximately $24,000, and to William his debts, personal and corporate, of approximately $600,000. In light of the evidence presented, we do not believe the court abused its discretion in awarding Carolyn $10,000 in marital property. (*In re Marriage of Caldwell* (1984), 124 Ill. App. 3d 898, 465 N.E.2d 523.) Nor do we believe the evidence supports Carolyn's assertion of a dissipation of marital assets. Further, this issue was not raised in the trial court and is waived for purposes of our review. *Bennett v. Raag* (1982), 103 Ill. App. 3d 321, 431 N.E.2d 48.

■ The trial court denied Carolyn her request for rehabilitative maintenance. Carolyn argues that the court abused its discretion in denying her maintenance. However, Carolyn did not support her request for rehabilitation with any evidence of the amount of education, expense, or time she needed to be rehabilitated. Carolyn testified that if she went to school or worked full time she would also incur child care expense, but again, she did not specify a particular amount.

This was a marriage of six years' duration. The last three years the couple were separated. Carolyn, who was 27 years old at the time

of the proceedings, testified that her total monthly expenses were $1,544 per month. She testified to a variety of past jobs in one of which she had earned approximately $1,600 per month. Carolyn was awarded $10,000 in marital property out of a marital estate in which the debts appear to exceed the assets. The evidence suggests that William remains in a highly leveraged financial position. These factors, together with the vague quality of Carolyn's maintenance request, support the trial court's decision not to award Carolyn rehabilitative maintenance. See Ill. Rev. Stat. 1985, ch. 40, par. 504.

Carolyn also contends that the trial court abused its discretion in failing to grant her a continuance to present a witness from Bennett Communications. The trial commenced on September 2, 1988. The Bennett witness was not subpoenaed until September 22, 1988, and was unable to be in court on the date requested, September 26, 1988, the second and final day of the trial. Carolyn requested that the witness be allowed to testify on the day set aside for final arguments. The court denied Carolyn's request.

■ We do not believe the court abused its discretion in failing to grant a continuance so that Carolyn could present her witness. Carolyn did not demonstrate to the court a sufficient excuse for any delay. (See 107 Ill. 2d R. 231(f).) Once a case has reached the trial stage, the moving party must give especially grave reasons for a continuance. (*Stern v. Stern* (1989), 179 Ill. App. 3d 313, 534 N.E.2d 533.) We do not believe Carolyn's comparisons to the situation in *Stern* are apt. In *Stern*, the petitioner argued that she was emotionally unable to attend the trial on the date scheduled. Further, the respondent in *Stern* continually ignored the petitioner's discovery requests, making it necessary for the petitioner to call an additional witness. Carolyn was aware as early as July of 1987 that William's employment status had changed and that he was or was to become an employee of Bennett Communications. She did not give the trial court any sufficient reason for her lack of diligence in serving the Bennett witness. As such, the trial court properly denied Carolyn's request for a continuance.

■ Carolyn's final argument is that the trial court erred in failing to grant her request for a new trial based on newly discovered evidence. In her motion for a new trial, Carolyn asserted that she was in possession of newly discovered evidence showing that Alpha-Com, William's corporation, was still in active operation. Attached to Carolyn's motion was her affidavit stating that she had also learned that American Plastic Pallets still maintained a telephone number and was located at the same address as Alpha-Com. Carolyn also attached

to her motion copies of newspaper advertising that listed Alpha-Com as one of numerous distributors of the "Cellular One" mobile phone. She also submitted copies of Alpha-Com documents showing proposed work orders for installation of cellular phone systems.

We do not believe that Carolyn's new alleged evidence would change the result of the trial court if a new trial were granted. (*Tuttle v. Fruehauf Division of Fruehauf Corp.* (1984), 122 Ill. App. 3d 835, 462 N.E.2d 645.) Carolyn has not shown that at the time of the trial court's disposition, William's corporation was still active. That William testified at trial that Alpha-Com was at the time dormant does not preclude the possibility that after the dissolution proceeding the company was reactivated. Even if Alpha-Com were still in operation during the trial, Carolyn has not proposed any evidence to show that William's financial condition was different than the evidence at trial indicated. Given that the Illinois Marriage and Dissolution of Marriage Act is geared towards a party's present ability to pay, and not future financial resources (see *Coons v. Wilder* (1981), 93 Ill. App. 3d 127, 416 N.E.2d 785), we do not believe that Carolyn has demonstrated that the trial court's disposition could be any different if the case were retried. For these reasons, the judgment of the trial court is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.